AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Geto Dorlizier and Jourmel Thomas | ) | Case No. 13 - 8277 - JMH |
| | ) | |
| *Defendant(s)* | ) | |

**CRIMINAL COMPLAINT**

**SEALED**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __4/29/2013 - 5/20/2013__ in the county of __Palm Beach__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371, 641, and 501 | Conspiracy to steal money of the United States and to forge endorsements on Treasury checks |

This criminal complaint is based on these facts:
see attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Daniel J. Szczepanski
*Printed name and title*

*I find probable cause. J MH*
Sworn to before me and signed in my presence.

Date: 6-3-13

_____
Judge's signature

City and state: __West Palm Beach, Florida__   James M. Hopkins, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT AND SEARCH WARRANTS

I, Daniel J. Szczepanski, being duly sworn, depose and state:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the West Palm Beach Resident Agency. I have been a Special Agent with the FBI for seven years. My work with the FBI has primarily been to investigate white collar crime to include identity theft and tax return fraud in South Florida. I submit this affidavit from personal knowledge based on my participation in this investigation, discussions with undercover agents (UCEs) involved in meetings and telephone calls with subjects, discussions with fellow agents, and review of consensually recorded telephone calls and meetings.

2. I submit this affidavit in support of an application for a complaint charging GETO DORLIZIER (DORLIZIER) and JOURMEL THOMAS (THOMAS) with conspiracy to steal money of the United States and to forge endorsements on Treasury checks, in violation of 18 U.S.C. §§ 371, 641, and 510 and applications for warrants to search 85 SW 5th Avenue, Suite 102, Delray Beach, Florida, 33444 ("target location 1") and 7130 South Military Trail, Lake Worth, Florida, 33463 ("target location 2"). The target locations are accurately described in Attachment A.

3. Because this affidavit is submitted for the limited purpose of obtaining a complaint and two search warrants, I have not set forth each and every fact learned during the course of this on-going investigation.

## SUMMARY OF INVESTIGATION

4. On or about April 24, 2013, a confidential human source (CHS) reported to law enforcement authorities that DORLIZIER and THOMAS had sought to have CHS, through his business, cash fraudulent income tax checks. At the direction of law enforcement authorities,

CHS later referred THOMAS to an FBI Undercover Employee (UCE 1), stating that UCE 1 could cash checks for DORLIZIER and THOMAS. CHS gave THOMAS UCE 1's cellular telephone number.

5. On or about April 29, 2013, UCE 1 received several telephone calls from telephone number (561) 860-6124. UCE 1 did not answer these calls and the caller did not leave any messages. Record checks revealed that the telephone number was subscribed to by JT's PAPERWORKS &TAX SVCS, JOURMEL THOMAS.

6. On or about April 30, 2013, UCE 1 called (561) 860-6124. The call was recorded. The individual that answered the telephone call identified himself as "JOURMEL." JOURMEL said that he had income tax refund checks that he wanted UCE 1 to cash. UCE 1 and JOURMEL agreed to meet on May 2, 2013 at 10:00am at an undercover FBI facility located in Palm Beach County, which UCE 1 described as his office. JOURMEL said he would be accompanied by his brother, whom he identified as "GETO".

7. On or about May 2, 2013, UCE 1 and a second FBI Undercover Employee (UCE 2) met with DORLIZIER and THOMAS at the undercover facility. The meeting was audio and video recorded. During the meeting, the UCEs told DORLIZIER and THOMAS that the UCEs operated businesses through which they could cash checks. DORLIZIER and THOMAS explained to the UCEs that they operate income tax preparation services with numerous locations in South Florida. THOMAS provided a business card for his business, JT'S PAPERWORKS & TAX SERVICES, located at target location 2. DORLIZIER said that the income tax refund checks that DORLIZIER and THOMAS provided the UCEs would be referred to in subsequent conversations as "candles" or "candle lights". The number of "candles" or "candle lights" would refer to the number of income tax checks DORLIZIER or THOMAS would bring to the UCEs to

2

cash.

8. Also during this meeting on May 2, 2013, DORLIZIER and THOMAS told the UCEs that, in addition to income tax checks, DORLIZIER and THOMAS would give them copies of driver's licenses and social security account numbers for the payees of the checks. DORLIZIER indicated that they would be providing income tax refund checks issued by the U.S. Treasury, Advent, and E-Collect. Tax refunds issued by Advent and E-Collect are commonly referred to as refund anticipation loans (RAL), which are loans provided by a third party (i.e. Advent and E-Collect) against a taxpayer's expected refund. DORLIZIER and THOMAS indicated that their tax services had the ability to print these RAL checks in their offices. DORLIZIER explained to the UCEs that last year he had over $1 million of income tax checks cashed at another location in Delray Beach, FL.

9. DORLIZIER explained that in some instances he would file income tax returns for people whom he referred to as "basers". DORLIZIER cited an example where he pays the baser $1,000, utilizes the baser's identifying information to file a tax return seeking an inflated refund of $4,000, and then DORLIZIER keeps the difference. DORLIZIER describes a "baser" in a later recorded meeting on May 17, 2013 as a drug addict. In return for cashing the income tax checks, DORLIZIER and THOMAS agreed to pay the UCEs 50% of the value of the checks they cashed. Also, the UCEs told DORLIZIER and THOMAS that they (the UCEs) could provide DORLIZIER and THOMAS with names, dates of birth, and social security numbers of individuals, so that DORLIZIER and THOMAS could file income tax returns for those individuals without their knowledge. DORLIZIER and THOMAS stated that they would discuss this possibility with the UCEs at a subsequent occasion. DORLIZIER provided his cellular telephone number of (561) 251-2018.

3

10. On or about May 2, 2013, at approximately 4:38pm, UCE 1 received a text message from THOMAS, telephone number (561) 860-6124, which said the following: "keep in touch we do have some candles".

11. On or about May 7, 2013, UCE 2 met with THOMAS at the undercover facility in Palm Beach County, FL. The meeting was audio and video recorded. During the meeting, UCE 2 and THOMAS re-negotiated the previously agreed upon percentage for the UCEs to cash income tax refund checks. In return for cashing these income tax checks, THOMAS and UCE 2 agreed that the UCEs would receive 25% of the face value, and THOMAS would receive the remaining 75% of the face value. In addition, THOMAS and UCE 2 agreed to a 50% payment split for income tax returns that THOMAS would file utilizing identity information provided by the UCEs. UCE 2 provided THOMAS with identifying information for two purported individuals, including names, dates of birth, and social security account numbers. The identities provided to THOMAS were contrived by law enforcement; in other words, the identified people did not really exist. THOMAS advised that the income tax returns would be available in two (2) weeks.

12. Also during this meeting on May 7, 2013, THOMAS provided UCE 2 with four (4) U.S. Treasury checks totaling $11,880.83, along with copies of purported Florida driver's licenses for three (3) of the payees on the checks. The respective U.S. Treasury checks were already endorsed in the name of the payee when THOMAS gave them to UCE 2. THOMAS also provided UCE 2 with three (3) E-Collect Refund Anticipation Loan (RAL) checks totaling $1,412.00, along with copies of purported Florida driver's licenses for the three (3) payees on each of the RAL checks. These RAL checks were not endorsed, but a social security account number was written on the back of each check. UCE 2 requested that THOMAS sign each of

these RAL checks since UCE 2 was not good at forging signatures. THOMAS signed the payees' names on the backs of the three (3) RAL checks. In return for cashing these checks, UCE 2 then paid THOMAS $10,000 in cash, representing THOMAS's share of the value of the checks. This payment to THOMAS represented approximately 75% of the face value of checks he provided UCE 2 to cash.

13. On or about May 9, 2013, UCE 2 met with THOMAS at his place of business, JT'S PAPERWORKS & TAX SERVICES, located at target location 2. The meeting was audio recorded. During the meeting, THOMAS provided UCE 2 with two (2) RAL checks totaling $9,823.55. THOMAS provided a copy of a purported Florida driver's license for one of the two RAL checks, and said he would provide UCE 2 with the other Florida driver's license at a later date. THOMAS also provided UCE 2 with a copy of a purported Florida driver's license for the payee on one of the U.S. Treasury checks that THOMAS had provided UCE 2 during their previous meeting on May 7, 2013. As previously described, on May 7, 2013, THOMAS gave UCE 2 seven checks, but only six copies of driver's licenses.

14. Also during this meeting on May 9, 2013, UCE 2 provided THOMAS with two (2) contrived identities for THOMAS to manufacture two (2) paper copies of Florida driver's licenses. In return for producing these fictitious copies of Florida driver's licenses, UCE 2 agreed to pay THOMAS $75 each. UCE 2 asked THOMAS if it was possible to manufacture "hard copy" Florida driver's licenses. THOMAS then contacted an unknown person from his cellular telephone. After hanging up, THOMAS said it was possible, but that the driver's license could not be used as a real license. THOMAS told UCE 2 that the person on the phone indicated that the cost for the fictitious driver's licenses would start at $550 per license.

15. On or about May 10, 2013, UCE 2 met with THOMAS at the undercover facility

5

in Palm Beach County, FL. The meeting was audio and video recorded. During the meeting, UCE 2 paid THOMAS $6,300 in cash, which represented 75% of the face value of the checks received on May 9, 2013, less $1,000. It was agreed that UCE 2 would pay THOMAS the remaining $1,000 the following week. THOMAS also provided UCE 2 with a copy of a purported Florida driver's license for the payee on one (1) of the RAL checks THOMAS had provided UCE 2 during their previous meeting on May 9, 2013. THOMAS also provided UCE 2 with a paper copy of one (1) Florida driver's license containing the contrived information provided by UCE 2 during the meeting on May 9, 2013.

16. On or about May 13, 2013, UCE 2 met with THOMAS at his place of business, JT'S PAPERWORKS & TAX SERVICES, located at target location 2. The meeting was audio recorded. During this meeting, UCE 2 paid THOMAS $1,000, which was owed to THOMAS for the RAL checks previously provided on May 9, 2013. THOMAS also provided UCE 2 with the second and final Florida driver's license containing the contrived information provided by UCE 2 during the meeting on May 9, 2013. In addition, UCE 2 paid THOMAS $150 for the two (2) copies of the Florida driver's licenses THOMAS had given UCE 2 bearing contrived information provided by UCE 2 on May 9, 2013.

17. On or about May 15, 2013, UCE 1 and UCE 2 met with DORLIZIER and another black male who identified himself as JEMSLEY (ph.) at an undercover facility located in Palm Beach County, FL. DORLIZIER later referred to JEMSLEY as his cousin JOULETTE (ph). The meeting was audio and video recorded. During the meeting, DORLIZIER and the UCEs re-negotiated the previously agreed upon percentage for the UCEs to cash income tax refund checks. In return for cashing these income tax checks, DORLIZIER and the UCEs agreed that the UCEs would receive 30% of the face value of the checks, and DORLIZIER would receive

6

the remaining 70% of the face value. DORLIZIER provided the UCEs with seven (7) U.S. Treasury checks totaling $76,612.00. DORLIZIER also provided copies of Florida driver's licenses in the names of five (5) of the seven (7) payees on the respective U.S. Treasury checks. DORLIZIER advised that he would provide the other two (2) driver's licenses for the remaining two (2) U.S. Treasury checks at a later date.

18.   Also during the meeting on May 15, 2013, DORLIZIER stated that he was utilizing another check cashing business located in Boca Raton, FL. DORLIZIER advised that this check casher in Boca Raton cashed over $10,000,000 worth of income tax checks this year, and $18,000,000 last year. DORLIZIER explained that this check casher in Boca Raton cashed the U.S. Treasury checks for a 30% fee and the other checks for a 25% fee. DORLIZIER indicated that some of the people whose names appear on the income tax checks are unaware that income tax returns were filed in their names. DORLIZER also stated that he files tax returns for clients who "don't work for real".

19.   Also during the meeting on May 15, 2013, DORLIZIER stated that he purchased a six (6) bedroom house located in Canyon Isles for $575,000 in cash. Record checks revealed that DORLIZIER purchased a residence in the Canyon Isles development located in Boynton Beach, FL for $574,900 in March 2013. Record checks also indicate there are no recorded liens or encumbrances against this property. Also during this meeting, DORLIZIER offered to bring his employees and his laptop computer to the undercover facility to prepare and electronically file income tax returns from identities provided by the UCEs.

20.   After the meeting on May 15, 2013, the UCEs noticed that the (7) U.S. Treasury checks provided by DORLIZIER were not endorsed and that the five (5) copies of the Florida driver's licenses lacked signatures.

7

21.     On or about May 17, 2013, UCE 1 and UCE 2 met with DORLIZIER at his place of business, ATLANTIC MULTI-SERVICES, located at target location 1. The meeting was audio and video recorded. During this meeting, the UCEs gave back to DORLIZIER the unendorsed income tax checks and the unsigned copies of purported Florida driver's licenses that DORLIZIER had given the UCEs on May 15, 2013. In addition, the UCEs discussed with DORLIZIER the fact that DORLIZIER had not given the UCEs copies of driver's licenses corresponding to several of the checks that DORLIZIER had given the UCEs on May 15, 2013. The UCE's explained that they needed copies of the purported Florida driver's licenses, complete with signature, in order to cash the checks. DORLIZIER stated that he produces, in his office, copies of the purported Florida driver's licenses with names corresponding to the payees on the income tax checks. DORLIZIER then provided the copies of the Florida driver's licenses that lacked signatures to an employee whom he identified as "EVEY" (ph.), and instructed her to have other people in the office sign the driver's licenses. Shortly thereafter, UCE 1 observed "EVEY" making copies of the signed Florida driver's licenses, which she later gave back to DORLIZIER during this meeting.

22.     Also during this meeting on May 17, 2013, DORLIZIER provided the UCEs with nine (9) U.S. Treasury checks totaling $9,610.68 and one (1) Advent RAL check totaling $5,746.05. In addition, DORLIZIER provided a Florida driver's license and social security card for the Advent RAL check. DORLIZIER said he would provide copies of Florida driver's licenses in the names of the payees for the U.S. Treasury checks at a later date. At the time when DORLIZIER provided the UCEs with these checks, none of them were endorsed in the names of the payees. UCE 1 requested that DORLIZIER have someone sign the payees' names on the backs of the income tax checks. DORLIZIER advised that one of his employees would do so.

DORLIZIER took the checks to an adjacent office. The UCEs went to the adjacent office and witnessed DORLIZIER signing three (3) of the U.S. Treasury checks.

23. Also during this meeting on May 17, 2013, DORLIZIER explained to the UCEs that he had a sophisticated video surveillance system in his office suite, which captures video footage of the whole inside and outside of his office. DORLIZIER advised that this video surveillance system is backed up to a hard drive. Based on this, Affiant believes that images of criminal activity, as well as the identities of other co-conspirators, may be recorded on this hard drive.

24. Also during this meeting on May 17, 2013, DORLIZIER explained that "basers" are individuals who are drug addicts who sell DORLIZIER their identifying information. DORLIZIER explained an example where he paid an individual $150 for his identifying information, then filed a fraudulent income tax return for $1,000. DORLIZIER then signs the "baser's" name on the income tax check and keeps the difference. DORLIZIER stated that he offers to pay the "basers" an additional $50 for any referrals. DORLIZIER stated that he keeps everything on paper. Furthermore, DORLIZER showed the UCEs examples of documents pertaining to tax filings for the "basers", which DORLIZIER removed from his desk drawer. DORLIZIER then showed the UCEs a filing cabinet in his office containing information pertaining to his clients which was used to file fraudulent income tax returns.

25. DORLIZIER also provided the UCEs an example of a form he (DORLIZIER) utilizes to track which income tax return checks were cashed at a particular check cashing entity. The form given to the UCEs was entitled ATLANTIC MULTI-SERVICES, Check Distribution List, and illustrated an income tax check distribution list where 16 individuals' income tax checks were cashed a particular location on March 14, 2013. DORLIZIER retrieved this list

9

from his desk drawer.

26.   Also during this meeting on May 17, 2013, DORLIZIER directed the UCEs to his computer, and showed the UCEs a listing of tax filings that DORLIZIER said contained 2,000 names. This comprehensive list identified the client's name, address, when the tax return was filed, and when the tax return was accepted by the IRS. DORLIZIER explained when the income tax return was filed, DORLIZIER had the ability, through his tax filing computer software, to have the income tax return checked mailed to an address controlled by DORLIZIER. DORLIZIER is able to do this because the individuals he is filing false income tax returns for are not employed.

27.   Also during this meeting on May 17, 2013, in order to document which income tax checks DORLIZIER was providing to the UCEs to cash, DORLIZIER utilized his cell phone to photograph the respective income tax checks for his own records.

28.   On or about May 20, 2013, UCE 2 met with DORLIZIER and another black male at an undercover facility located in Palm Beach County, FL. DORLIZIER had previously identified this individual during the meeting on May 17, 2013, as his business partner. The meeting on May 20, 2013 was audio and video recorded. During the meeting, UCE 2 paid DORLIZIER $5,500 in cash, which represented 70% of eight (8) of the U.S. Treasury checks received on May 17, 2013. DORLIZIER provided UCE 2 with eight (8) copies of Florida driver's licenses in the names of payees on previously provided income tax checks.

29.   On or about May 10, 2013 and May 13, 2013, as described in paragraphs 15 and 16, THOMAS gave the UCEs copies of purported driver's license bearing contrived identifying information previously provided by UCE 2. With the exception of this license, which I know to be in the names of fictitious persons, subsequent record checks have been performed on all the

10

other purported driver's licenses that DORLIZIER and THOMAS gave the UCEs. The record checks revealed that all the licenses were fraudulent, meaning that either the license numbers did not match a real driver's license; or the name on the license provided by DORLIZIER and THOMAS was different from the name on the real license with that license number; or the photograph, date of birth, and address on the license provided by DORLIZIER and THOMAS was different from the information on the real license.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

30. This application seeks permission to search for records in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31. I submit that if a computer or storage medium is found at the target locations, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

32.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the target location because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence

also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

33.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements. Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

  c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

34.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

Respectfully submitted,

_____
Daniel J. Szczepanski
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on June ___3___, 2013

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13 - 8277 - JMH

UNITED STATES OF AMERICA

vs.

GETO DORLIZIER and
JOURMEL THOMAS

   Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?     _____ Yes   __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?     _____ Yes   __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
Marc Osborne
Assistant United States Attorney
Court ID# A5500796
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel: (561) 209-1014
marc.osborne@usdoj.gov